**Jimmie Ronald BUTLER, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. C14–87–216–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 8, 1988.

Craig A. Washington, Houston, for appellant.

Winston E. Cochran, Jr., Houston, for appellee.

Before JUNELL, SEARS and CANNON, JJ.

## OPINION

SEARS, Justice.

This is an appeal from a conviction for the offense of conspiracy to commit capital murder. Appellant was found guilty by a

jury and, following a pre-sentence investigation, the trial court assessed his punishment at confinement for thirty years in the Texas Department of Corrections. We affirm.

Appellant asserts two points of error on appeal. In his first point of error, Appellant contends the evidence is insufficient to establish a conspiracy pursuant to TEX.PENAL CODE ANN. § 15.02.

The standard for reviewing the sufficiency of the evidence in both direct and circumstantial evidence cases is whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Sutherlin v. State,* 682 S.W.2d 546, 549 (Tex.Crim.App.1984); *Raleigh v. State,* 740 S.W.2d 25, 27 (Tex.App.—Houston [14th Dist.] 1987, no pet.). Appellant contends that the evidence is insufficient to corroborate the testimony of Appellant's co-conspirators that an agreement existed with Appellant to murder his ex-wife's husband.

Article 38.14 provides:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon 1979).

Testimony of an accomplice witness is sufficiently corroborated if, after eliminating the accomplice testimony from consideration, there is inculpatory evidence which tends to connect the defendant with the commission of the offense. The corroborating evidence need not directly link the defendant to the crime or be sufficient in itself to establish guilt. *May v. State,* 738 S.W.2d 261, 266–267 (Tex.Crim.App.1987), *cert denied,* —— U.S. ——, 108 S.Ct. 206, 98 L.Ed.2d 158 (1987).

TEX.PENAL CODE ANN. § 15.02 sets forth the elements of the offense of criminal conspiracy. The pertinent portions of § 15.02 read:

(a) A person commits criminal conspiracy if, with intent that a felony be committed:

(1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and

(2) he or one or more of them performs an overt act in pursuance of the agreement.

(b) An agreement constituting a conspiracy may be inferred from acts of the parties.

TEX.PENAL CODE ANN. § 15.02 (Vernon 1974).

The evidence shows that on December 10, 1975, Mr. Raymond Winkler and Mr. Dale Cureton were arrested in the parking lot of Deerbrook Mall in Humble, Texas. The police stopped their truck after observing them run a stop sign and travel at a speed of 37 miles per hour in a 20 mile per hour zone. The driver, Winkler, was asked to produce identification. As Winkler exited the vehicle, a can of beer and a live .44 magnum shell fell out onto the ground. The officer testified that Cureton, the passenger, failed to comply with the order to place his hands on the dash and was instead reaching down to the floor of the vehicle. When the officer went to the passenger side of the vehicle he saw a stainless steel .44 magnum and several rounds of ammunition lying on the floorboard. Both Winkler and Cureton were arrested and an inventory of the truck revealed a 12–gauge sawed-off shotgun, two boxes of shotgun shells, a number of hollow point .44 magnum shells, a pair of gloves, three masks, two handwarmers, a Mississippi license plate and a map. Several Mandrax tablets were recovered from the person of both Winkler and Cureton. A check of the Mississippi license plate showed it to be stolen.

The police questioned Cureton and Winkler separately. Both told the police they had the guns and masks in the vehicle because they had been hired by Appellant to kill his ex-wife's husband, Mr. Clark Johnson.

Cureton agreed to tape-record a conversation with Appellant. In this conversation Cureton told Appellant that he and Winkler had been arrested and that the police had discovered the masks, guns and ammunition. Appellant expressed dismay at this turn of events, particularly that the ammunition had been discovered and promised to help Cureton get out of jail. Cureton gave Appellant a telephone number at which he said Winkler could be reached. The telephone number was for a pay telephone at the Humble jail. Two telephone conversations between Appellant and Winkler were subsequently recorded. All three recordings were introduced as evidence at trial.

Dale Cureton testified that he had known Appellant for several years. He stated that he moved into Appellant's home when he lost his apartment and that Appellant subsequently asked him if he could "do a job" for Appellant. Appellant told Cureton the "job" he wanted done was to have his ex-wife's husband killed. Initially, Cureton told Appellant that he would have to talk to someone else before he could give Appellant an answer. Cureton then discussed the "job" with Winkler, a friend who worked at the grocery store with him. Several days later Cureton told Appellant, "[W]e would go ahead and do it." Thereafter Appellant and Cureton discussed several methods of killing Johnson and the use of masks and a different license plate on the getaway vehicle.

Cureton further testified that about two weeks after he agreed to do the job, Appellant drove him to Johnson's house before daybreak and that Appellant waited in the car while Cureton examined the layout of Johnson's house. When Cureton returned to the car he made notes from which he prepared the map which was later discovered by the police. Cureton and Winkler were each to receive $1500.00 for the murder. Cureton was paid a $700.00 advance, a portion of which he gave to Winkler. Appellant provided Cureton and Winkler with the .44 Magnum, the 12–gauge shotgun, the ammunition and the Mississippi license plate. Appellant also provided a description of Johnson's car and Appellant's ex-wife's car, the license plate numbers and their home phone number. Appellant told Cureton he wanted Johnson killed before Christmas 1985, that he did not care how it was done, and that he did not want his ex-wife, Loretta, harmed. Cureton and Winkler went back to the Johnson house several times to ascertain the hours at which Mr. Johnson was likely to be at home. Cureton then bought the gloves and the masks with the money he received from Appellant.

Cureton testified that he had made an agreement with the State in exchange for his testimony. The State promised Cureton he would receive a three year term on a Motion to Revoke Probation and three years for possession of Mandrax, both to run concurrently, and that he would not be indicted for conspiracy to commit capital murder.

Mr. Robert Garcia, a friend and a co-worker of Appellant's, testified that one evening he, Appellant and Cureton went to Feathers Club for a few drinks. On the way home, he heard Appellant and Cureton discuss a "project" and one said to the other, "[I]f you cross me ... my friends can get you." Garcia also testified that Appellant was bitter about his wife having left him, and on one occasion Appellant told Garcia that he didn't care what happened to him because he would be either dead or in the penitentiary within a year. Garcia further testified that Appellant often talked about guns and had asked Garcia if he knew of anyone who wanted to sell a shotgun. Garcia told Appellant he knew someone who had a gun for sale and Appellant gave him $125.00 to purchase it. Garcia identified the sawed-off shotgun (seized by the police when Cureton and Winkler were arrested) as the gun he purchased for Appellant.

After Appellant was arrested he called Garcia. Garcia testified that when he told Appellant that he and some other co-workers had been interviewed by the police, Appellant said, "[S]hit, I might just go ahead and confess." He told Garcia to tell the truth and that he didn't really care what happened. Garcia stated that Appellant called him a second time and said, "[I]t

had [sic] happened now ... I am in jail now". Garcia understood this statement to be in reference to Appellant's earlier prediction that he would either be dead or in jail within a year.

Judy Ramirez testified that she and Appellant were friends and that she often had lunch with him and on a few occasions had gone out with him after work. She testified that on December 12, 1985, Appellant asked her to meet him in a park to talk. Appellant told Ramirez that he was tired of his ex-wife's new husband upsetting Appellant's son. Ms. Ramirez further testified as follows:

Q: As to the conversation that you had with Mr. Butler, what was he going to do about the problem that he had with his ex-wife's husband?

A: He said that he had hired two boys to have his ex-wife's husband killed.

Q: And who did he say was one of the boys?

A: Dale.

Q: The Dale that you testified to seeing up at his house?

A: Yes.

Appellant's ex-wife, Loretta Johnson, also testified at trial. She stated that she had been having an affair and that Appellant told her to leave. She testified that during a subsequent telephone conversation Appellant threatened to kill her and Mr. Johnson and testified that he told her, "[H]e had $40,000 in his pocket and he could have us blown away or he would have us picked up and dumped in the ocean and our bodies would never be found." When her divorce attorney suggested that she attempt to obtain visitation rights to the children, her request was met with additional threats. Appellant told her that if she had anything changed that his lawyer had prepared she would be sorry, and she testified, "[H]e used the terms he would blow us away ... or have us blown away." Mrs. Johnson stated that she gave up her attempts to obtain visitation rights because of Appellant's repeated threats.

Winkler testified that he, Cureton and Appellant's eldest son, James, worked together at Clayton's Supermarket. He stated that he had known Cureton for eight to ten years. Winkler testified that one night as they were driving in Winkler's truck Cureton told him Appellant "wanted a job to be done" but did not tell him what the job was at that time. He, Cureton and Appellant then met at Appellant's house to discuss the job. Appellant told Winkler that he "wanted Mr. Johnson killed" and asked if Winkler and Cureton would do it or would he have to get someone else to do it. Winkler testified that he was very interested in the job: "[A]nything for money, of course." Winkler testified that Appellant explained that he wanted Johnson killed so that he could get back with his ex-wife. Winkler stated that on several occasions the three of them discussed ways of killing Johnson. One discussion took place in Appellant's bedroom and at that time Appellant showed Winkler and Cureton several guns. Winkler told Appellant he liked the .44 and Cureton chose the shotgun. Winkler testified that Appellant gave Cureton money to buy the 'masks and gave them the guns and the license plate. Winkler and Cureton drove over to Johnson's house several times to familiarize themselves with the streets.

During the tape recorded conversation in which Cureton called Appellant, Appellant identified himself as Mr. Butler. Cureton told Appellant he was in jail for possession of Mandrax and that Winkler had already gotten out of jail. Cureton gave Appellant a number at which he could reach Winkler. This phone number was actually the number for the pay telephone at the Humble jail. Appellant promised that he would help Cureton raise the money necessary to get out of jail on bond. Cureton told Appellant that the police found all of the things in Raymond's truck. Cureton asked if the police could trace the guns. Appellant told him the guns were probably "clean" and that they were old and not registered. Appellant asked if the police had found the masks and license plate. When Cureton told him they had, he complained that he had told Raymond to stash that stuff somewhere. Appellant stated,

"[B]y the looks of things it looks really F___ed up."

Appellant then called Winkler and during that recorded conversation Appellant called himself Jimmie Butler. Appellant and Winkler discussed raising bond money for Cureton. Appellant asked if they were caught with all the guns in the car and when Winkler said they were, Appellant commented that they needed to try to get them back. Winkler stated that he "wanted to do that job" and asked if Appellant could get more guns. Appellant told him he wanted to try and get the guns back from the police, but stated that he had:

"[A] couple of low caliber pistols ... couldn't go through walls and doors and shit like those others. You know we had it rigged on that other where we could blow the shit out of everything and everybody. But I got a .38 ... a little snub nosed ... you have to be close ... and a .32 ... I just bought it the other day ... I've got those two pistols, but it would have to be a walk up and get 'em job. You sure the phone ain't bugged? ... No, I still want to go for that job, it may be Goddamned before Christmas, I was gonna wait but I don't guess it makes a Goddamn ... just Goddamn want it done, just want that son of a bitch done."

Appellant again stated that he wanted Johnson killed and promised to call again later in the day. Appellant called Winkler again and discussed meeting later so that he could give Winkler more guns. Appellant told Winkler he had four small caliber pistols in his car.

■ We find Appellant's statements, coupled with the discovery of the shotgun in Winkler's vehicle and the testimony of Mrs. Johnson, Mrs. Ramirez and Mr. Garcia, sufficient to corroborate the testimony of the accomplice witnesses regarding Appellant's agreement to a plan to murder Mr. Johnson. Point of error one is overruled.

In his second point of error, Appellant asserts the trial court erred in overruling his Motion for an Instructed Verdict because the State failed to prove the co-con-spirators agreed with Appellant to commit the murder. Appellant argues that neither Cureton nor Winkler ever testified regarding a particular time that they specifically indicated to Appellant that they would participate in the conspiracy.

■ A conspiracy exists where two or more persons as shown by words or deeds agree to do an unlawful act. *Gomez v. State*, 709 S.W.2d 351, 354 (Tex.App.—Houston [14th Dist.] 1986, pet. ref'd). It may be established by circumstantial evidence. *Gomez v. State*, 709 S.W.2d at 354. We find from our review of the record that while both co-conspirators' testimony was at times evasive, both did testify that they specifically communicated to Appellant their agreement to participate in the plan. Cureton testified that after he spoke to Winkler about Appellant's proposed job, "I told Mr. Butler [Appellant] that we would go ahead and do it." Winkler testified that he was interested in the job when Cureton and Appellant told him about it and that he would do anything for money. He further testified that he did agree to commit the murder, but that he could not remember when.

Both Cureton and Winkler performed overt acts in furtherance of their agreement. Cureton solicited Winkler's aid in committing the murder, bought the gloves and masks to be used in the murder, and went with Appellant to Johnson's house to survey the premises. Winkler and Cureton drove to Johnson's house several times to familiarize themselves with the streets and discussed ways to alter the appearance of Winkler's truck so that it could not be identified. Cureton and Winkler discussed different methods of committing the murder with Appellant. Appellant gave Cureton and Winkler weapons to use to kill Johnson, a stolen license plate to put on Winkler's truck, and he gave Cureton a $700.00 advance payment for the murder. Appellant apparently believed he had received their assent since he told Ramirez that he had hired two boys to commit the murder.

Viewed in the light most favorable to the verdict, we find the evidence was sufficient to prove that Cureton and Winkler agreed with Appellant to murder Johnson. Point of error two is overruled.

Accordingly, the judgment of the trial court is affirmed.