

NUMBER 13-07-446-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JONATHAN KEITH GARDNER,                                            **Appellant,**

**v.**

THE STATE OF TEXAS,                                            **Appellee.**

### On appeal from the 163rd District Court
### of Orange County, Texas

## MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Vela**
**Memorandum Opinion by Justice Vela**

A jury found appellant, Jonathan Keith Gardner, guilty of aggravated robbery[1] and

assessed his punishment at twelve years in prison, plus a $10,000 fine.  In five issues,

---

[1]*See* TEX. PENAL CODE ANN. §§ 29.02, 29.03(a)(2) (Vernon 2003).

Gardner challenges the legal and factual sufficiency of the evidence to support his conviction and complains of charge error. We affirm.

I. Factual Background

*A. State's Evidence*

On the morning of November 2, 2006, Rosemary Pollard went to the home of Ronald Mills, Jr., in Orange, Texas, and told Horace Lesiene she wanted to talk to Mills. Lesiene told Pollard that Mills did not want to talk to her. After Lesiene left Mills's house, Mills saw Pollard in his garage. She told Mills she had left her purse in his house. Mills let her inside, and while they looked for the purse, Gardner and Steven Lewis came into Mills's kitchen. When Mills saw them in the kitchen, both told him, "'This is a robbery, fool.'" Gardner tried to knock Mills out by hitting him with pots and pans. He also wanted to tie up Mills with a phone cord. While Mills fought Lewis, Gardner took knives from the kitchen table, and both men tried to stab Mills with the knives. Gardner told Mills, "'Give us your money. We're going to kill you.'" Lewis grabbed a butcher knife from the kitchen sink and plunged it into Mills's stomach. Mills testified that because he "was losing so much blood" he stopped fighting. When the prosecutor asked him, "So what did they take out of the kitchen?", he said, "[J]ust laptop computers." He said that money was also taken.

Mills underwent surgery to repair the stab wound to his stomach. He spent about three and one-half weeks in the hospital. Mills did not give any of the three permission to come into his house and steal his property.

At the time of the robbery, Ronald Preston, who was in a parked vehicle, saw an Explorer park near his vehicle. Three individuals, Gardner, another man, and a woman, got out of the Explorer and went into a house. A short time later, Preston saw two of them,

2

"Mr. Lewis" and "Ms. Rosemary," leave the house and get in the Explorer. He did not see Gardner get into the Explorer. After the Explorer left, the police arrived at the scene.

When Officer Kelli Griffin arrived at Mills's home, Mills told her that "Rosemary knocked on his door . . . . [H]e answered the door, [and] she started asking him questions about where a house was. Mills said while he was trying to explain where this house was, two other males entered the residence." Mills told Officer Griffin that he had been attacked. Officer Griffin, a former paramedic, testified that because of the amount of blood she saw at the scene, she felt Mills's injury could have been life threatening. She saw a bloody butcher knife inside Mills's garage, and she found a steak knife on his driveway. When the prosecutor asked Officer Griffin, "[D]o you believe that if this [butcher] knife were thrust into someone's abdomen, that it could cause serious bodily injury or possibly death?", she replied, "Yes." When the prosecutor asked her, "So, in your opinion, would this [butcher] knife be considered a deadly weapon?", she replied, "Yes, in my opinion, I do." On cross-examination, Officer Griffin said that Mills did not tell her that Rosemary Pollard had said anything about leaving her purse at his house.

Gardner, Lewis, and Pollard gave Detective Sarah Jefferson-Simon statements about their involvement in the incident. During the guilt-innocence stage, she read the statements to the jury. In his statement, Gardner said he had picked up Pollard and Lewis and that Pollard wanted to go to Mills's house to get "dope." Upon arrival, Pollard went to Mills's garage. About ten minutes later, she waved for Gardner and Lewis to come to the garage. Lewis got out and told Gardner that he was "going to get some dope." Gardner drove around the block a couple of times, went to Mills's door, and saw Mills "swinging at Bobo [Lewis] because Bobo had a knife in one hand and a screwdriver in the other." Lewis was asking Mills where the dope was. Gardner went into the house, asked Mills where the

drugs were, and hit Mills with his fist. After they left Mills's house, Pollard gave Gardner $300. He said Lewis told him that he had stabbed Mills.

Pollard's statement reflects that she, Gardner, and Lewis went to Mills's house to buy marihuana and that Gardner and Lewis attacked Mills, hitting him with their fists. Lewis asked Mills where the money was. Mills told him he had $300 and that they could take it. Pollard grabbed the money and took a camera. She said Gardner took Mills's laptop computer. She saw Gardner hit Mills twice with a steel pot. When they got in the truck, Lewis said that he had "cut Mr. Mills."

In his statement, Lewis stated that he, Pollard, and Gardner went to Mills's house to buy marihuana. When Lewis gave Mills five dollars, Mills "went to tripping and swung off from me, and I swung back at him, and the fight ensued." Mills grabbed a knife, and during the fight, Mills "some kind of way" "got stabbed, and once that happened, everybody left the house, because Ronald [Mills] was hollering." Lewis said that he left on foot and that the others left in the truck. He later met with Pollard and Gardner at which time Pollard gave them each $100.

*B. Defense Evidence*

Gardner testified that at the time in question, he, Lewis, and Pollard went to Mills's house for the purpose of getting some blunts (marihuana rolled up in a cigar). Upon arrival, Pollard went into the house and then returned, telling them Mills did not have any marihuana. Lewis decided to ask Mills himself and went into the house. About two minutes later, he and Pollard went to the house and saw Mills and Lewis "tussling." Mills was "swinging his hands" and Lewis "was going at him like this with a knife." Gardner testified that "When I stepped in, Mr. Mills, he seen me, and he hit me upside my head,

4

and out of reflex, I struck him out. I admit, I did hit the man." Gardner left after he saw what was going on. He denied any involvement in the robbery. He said that he and Pollard left in the vehicle and that Pollard gave him about $300. Gardner testified that after the incident, he "hauled tail" and went to Beaumont.

Gardner testified that he had two felony convictions, one for delivery of a controlled substance and the other for unauthorized use of a motor vehicle.

Neither Lewis nor Pollard testified at trial.

## II. Discussion

*A. Sufficiency of the Evidence*

In his first issue, Gardner challenges the legal and factual sufficiency of the evidence to support his conviction. In reviewing the legal sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hampton v. State*, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. The trier of fact is the sole judge of the weight and credibility of the evidence. TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394,

406 (Tex. Crim. App. 2000).

In reviewing a factual sufficiency claim, we review the evidence in a neutral light rather than the light most favorable to the verdict. *Neal v. State*, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000)). Evidence is factually insufficient if the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, or if the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust. *Neal*, 256 S.W.3d at 275; *Roberts*, 220 S.W.3d at 524 (citing *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). We do not reverse for factual insufficiency if the greater weight and preponderance of the evidence actually favors conviction. *Neal*, 256 S.W.3d at 275; *Roberts*, 220 S.W.3d at 524 (citing *Watson*, 204 S.W.3d at 417).

*1. The Charge*

In this case, the jury could convict Gardner of aggravated robbery if they believed from the evidence beyond a reasonable doubt that on or about November 2, 2006, in Orange County, Texas either:

> STEVEN CURTIS LEWIS, did then and there, while in the course of committing theft and with intent to obtain and maintain control of property of Ronald Mills, Jr., without the effective consent of the said Ronald Mills, Jr., and with intent to deprive the said Ronald Mills, Jr., of said property, did then and there by using or exhibiting a deadly weapon, to wit: a knife, that in the manner of its use and intended use is capable of causing serious bodily injury or death, intentionally or knowingly cause bodily injury to Ronald Mills, Jr., by stabbing the said Ronald Mills, Jr., with said knife, and JONATHAN KEITH GARDNER, acting with the intent to promote or assist in the commission of the offense of aggravated robbery, aided or attempted to aid STEVEN CURTIS LEWIS to commit the offense of aggravated robbery;

6

OR

> JONATHAN KEITH GARDNER entered into a conspiracy with STEVEN CURTIS LEWIS to commit the felony offense of robbery, and attempted to carry out that conspiracy, and in such attempt the felony of aggravated robbery was committed, and you further find the offense of aggravated robbery was committed in furtherance of the unlawful purpose of committing robbery, and you further find the offense of aggravated robbery should have been anticipated as a result of the carrying out of the conspiracy[.]

*2. Elements of Aggravated Robbery*

Section 29.02(a)(2) of the penal code defines robbery as follows: "A person commits an offense if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally or knowingly threatens or places another in fear or imminent bodily injury or death." TEX. PENAL CODE ANN. § 29.02(a)(2) (Vernon 2003). The offense becomes aggravated if the person "uses or exhibits a deadly weapon." *Id*. § 29.03(a)(2). The phrase, "'In the course of committing theft'" is defined as "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." *Id*. § 29.01(1). A person is guilty of an attempted offense "if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." *Id*. § 15.01(a).

*3. Knife as a Deadly Weapon*

Section 1.07(a)(17)(B) of the penal code defines deadly weapon as: "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (Vernon Supp. 2008). Regarding this section's meaning, the court of criminal appeals has stated: "The provision's plain language does not require that the actor actually intend death or serious bodily injury; an

object is a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury." *Bailey v. State*, 38 S.W.3d 157, 159 (Tex. Crim. App. 2001) (quoting *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000)).

A knife is not a deadly weapon per se,[2] and in this case, the jury was instructed that a deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (defining a deadly weapon); *McCain*, 22 S.W.3d at 503 (holding that "the mere carrying of a butcher knife during such a violent attack as occurred in . . . [that] case was legally sufficient for a factfinder to conclude that the 'intended use' for the knife was that it be capable of causing death or serious bodily injury"). Factors to consider in determining whether a knife was capable of causing death or serious bodily injury include (1) the knife's dimensions, (2) the nature of the wounds it inflected, (3) the manner of its use, (4) testimony of its life-threatening capabilities, (5) the physical proximity between the victim and the knife; and (6) the words spoken by the defendant. *See, e.g., Thomas v. State*, 821 S.W.2d 616, 619 (Tex. Crim. App. 1991); *Tisdale v. State*, 686 S.W.2d 110, 115 (Tex. Crim. App. 1984) (op. on reh'g); *Lowe v. State*, 211 S.W.3d 821, 828 (Tex. App.–Texarkana 2006, pet. ref'd).

*4. Law of Parties*

The charge authorized Gardner's conviction as a party to aggravated robbery pursuant to penal code section 7.02(a)(2) or (b).

*a. Section 7.02(a)(2)*

---

[2]*See Thomas v. State*, 821 S.W.2d 616, 620 (Tex. Crim. App. 1991).

8

Section 7.02(a)(2) states that: "(a) A person is criminally responsible for an offense committed by the conduct of another if: . . . "(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003). Thus, in order to convict Gardner of aggravated robbery under section 7.02(a)(2), the State had to prove that he aided and abetted Lewis with respect to each element of the offense. *Woods v. State*, 749 S.W.2d 246, 248 (Tex. App.–Fort Worth 1988, no pet.).

*b. Legal & Factual Sufficiency of the Evidence to Support Conviction Under 7.02(a)(2)*

"Evidence is sufficient to support a conviction under the law of parties where the actor is physically present at the commission of the offense, and encourages the commission of the offense either by words or other agreement." *Burdine v. State*, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986); *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985). The evidence must show that at the time of the offense, the parties were acting together, each contributing some part towards the execution of their common purpose. *Burdine*, 719 S.W.2d at 315. In determining whether a defendant participated in an offense as a party, the court may examine the events occurring before, during, and after the commission of the crime and may rely on the defendant's actions that show an understanding and common design to commit the crime. *Burdine*, 719 S.W.2d at 315; *Cordova,* 698 S.W.2d at 111; *Beier v. State*, 687 S.W.2d 2, 4 (Tex. Crim. App. 1985).

*c. Analysis*

A rational jury could have determined the following from the evidence that: (1) Gardner and Lewis came into Mills's home, and both told him, "This is a robbery, fool"; (2) Gardner tried to knock out Mills and wanted to tie him up; (3) while Mills fought Lewis,

9

Gardner found some knives, and both men tried to stab Mills; (4) Gardner asked Mills for money and told him they were going to kill him; (5) Lewis stabbed Mills in the stomach with a butcher knife; (6) the men took a laptop computer from Mills's kitchen; (7) Mills did not give Gardner, Lewis, or Pollard permission to take his property; (8) because of the amount of blood that she saw, Officer Griffin felt that Mills's injury could have been life threatening; (9) Officer Griffin considered the butcher knife a deadly weapon; (10) Mills had surgery to repair the stab wound caused by the butcher knife; and (11) Gardner, Lewis, and Pollard fled the scene after the robbery, and Gardner went to Beaumont.

The contrary evidence showed that: (1) according to Gardner's testimony, he had no involvement in the robbery; (2) Gardner did not plan with anyone to rob Mills; (3) Mills testified Pollard came to his house for her purse, but Officer Griffin testified Mills did not say anything about Pollard coming to his house for her purse; (4) Gardner took Pollard to Mills's house so she could get some "dope" or "blunts"; and, (5) Gardner did not stab Mills.

Viewing the evidence in the light most favorable to the verdict, we hold there was legally sufficient evidence to find Gardner guilty as a party under section 7.02(a)(2). The evidence showed beyond a reasonable doubt that: (1) the butcher knife used by Lewis to stab Mills in the stomach was, in the manner of its use and intended use, capable of causing death or serious bodily injury and, thus, a deadly weapon; (2) that in the course of committing theft and with the intent to obtain or maintain control of property, Lewis intentionally or knowingly threatened or placed Mills in fear of imminent bodily injury or death by using or exhibiting the butcher knife as a deadly weapon; and (3) that Gardner acted with the intent to promote or assist Lewis's commission of aggravated robbery, and he aided or attempted to aid Lewis by telling Mills they were there to rob him, trying to

10

knock him out, wanting to tie him up, trying to stab him, and taking Mills's laptop computer.

Viewing the evidence neutrally, we conclude that the evidence is not so contrary to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust or that the proof of guilt is against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414-15, 417; *Johnson*, 23 S.W.3d at 11. Accordingly, we hold that the evidence is legally and factually sufficient to support Gardner's conviction as a party under section 7.02(a)(2).

*d. Section 7.02(b)*

Under penal code section 7.02(b), a person is criminally responsible for an offense committed by the conduct of another if:

> [I]n the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE ANN. § 7.02(b) (Vernon 2003).

A conspiracy exists when two or more persons as shown by words or deeds agree to do an unlawful act. *Butler v. State*, 758 S.W.2d 856, 860 (Tex. App.–Houston [14th Dist.] 1988, no pet.). An agreement may be inferred from the parties' acts, *Snow v. State*, 721 S.W.2d 943, 948 (Tex. App.–Houston [1st Dist.] 1986, no pet.), and the State may prove conspiracy by circumstantial evidence. *Butler*, 758 S.W.2d at 860. The agreement must be before or contemporaneous with the criminal event. *Beier v. State*, 687 S.W.2d 2, 4 (Tex. Crim. App. 1985). While an agreement of the parties to act together in a common design seldom can be proven by direct evidence; reliance, therefore, may be placed upon the actions of parties, showing by either direct or circumstantial evidence an

11

understanding and common design to do a certain act. *Rivera v. State*, 990 S.W.2d 882, 887 (Tex. App.–Austin 1999, pet. ref'd), *see Burdine*, 719 S.W.2d at 315.

*e. Legal & Factual Sufficiency of the Evidence to Support a Conviction Under 7.02(b)*

Notwithstanding conflicting evidence, the jury was free to conclude Gardner conspired with Lewis to commit the robbery of Mills. *Burdine*, 719 S.W.2d at 314. The evidence established an implicit agreement between Gardner and Lewis to rob Mills. After Gardner and Lewis entered Mills's house, both of them told Mills, "'This is a robbery, fool.'" Gardner tried to knock out Mills and wanted to tie him up. Gardner grabbed knives from the kitchen table, and both men tried to stab Mills. When neither could subdue him, Lewis stabbed Mills in the stomach with a butcher knife. After that, Gardner helped Lewis take Mills's property. Gardner fled the scene and then "hauled tail" to Beaumont.

Viewing the evidence in the light most favorable to the verdict, we hold the jury could find beyond a reasonable doubt: Gardner and Lewis entered into a conspiracy to rob Mills and attempted to carry out that conspiracy; in such attempt, the offense of aggravated robbery was committed in furtherance of the unlawful purpose of committing robbery; and Gardner should have anticipated the aggravated robbery as a result of the carrying out of the conspiracy. The jury, therefore, was free to conclude that Gardner conspired with Lewis to commit the robbery of Mills and that each of them were "contributing some part towards the execution of their common purpose." *See Burdine*, 719 S.W.2d at 314; *Snow*, 721 S.W.2d at 949.

Viewing the evidence neutrally, we conclude the evidence is not so contrary to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust or that the proof of guilt is against the great weight and preponderance of the evidence. *See Watson*,

12

204 S.W.3d at 414-15, 417; *Johnson*, 23 S.W.3d at 11. Accordingly, we hold that the evidence is legally and factually sufficient to support Gardner's conviction as a party under section 7.02(b). Issue one is overruled.

*B. Jury Unanimity*

In his second issue, Gardner argues the trial court, over counsel's objection, erred in disjunctively submitting the case to the jury without requiring the jury to unanimously agree on which subsection—7.02(a)(2) or 7.02(b)—of the penal code was applicable to him. The charge authorized the jury to convict Gardner of aggravated robbery if the jury found he either assisted Lewis to commit aggravated robbery (section 7.02(a)(2)) or conspired with Lewis, who committed aggravated robbery in furtherance of the conspiracy (section 7.02(b)).

In reviewing the charge, we must first decide whether error exists. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). If we find error, we must perform a harm analysis. *Id.*

The Texas Constitution includes a due course of law protection along with the requirement that only a unanimous jury may convict a defendant charged with a felony. *See* TEX. CONST. art. I, § 19, art. V, § 13; *see also* TEX. CODE CRIM. PROC. ANN. art. 36.29(a) (Vernon Supp. 2008). The Sixth Amendment guarantees a right to trial by jury while the Fourteenth Amendment contains due process protections, which the Supreme Court has determined require juries to find every element of a charged offense beyond a reasonable doubt. *See* U.S. CONST. amends. VI, XIV; *In re Winship*, 397 U.S. 358, 364 (1970). The penal code also requires that "no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt." TEX. PENAL

13

CODE ANN. § 2.01 (Vernon 2003).

Therefore, if a person is charged with two different offenses, a jury may only convict the person of both offenses if the jury unanimously agrees the State has proven every element of each offense beyond a reasonable doubt. *Hanson v. State*, 55 S.W.3d 681, 693 (Tex. App.–Austin 2001, pet. ref'd). When a defendant is tried for two different and separate offenses, a general jury charge including both offenses submitted in the disjunctive would be inappropriate. *Id*.

This rule, however, does not apply to alternate methods or means by which an accused is charged with committing the one-charged offense. In *Hanson v. State*, Hanson was charged with the single offense of capital murder, and the charge authorized conviction on a finding that he either assisted another to commit the offense (under section 7.02(a)(2)) or conspired with another who committed the offense in furtherance of the conspiracy (under section 7.02(b)). *Id*. at 694. Like the charge in the case before this Court, the charge in *Hanson* was submitted in two separate application paragraphs joined by "or." *See id*. at 693. The *Hanson* court stated, "The two alternate theories of party liability were merely alternate methods or means by which [Hanson] committed the one charged offense. Jury unanimity as to which theory of party liability applied was not necessary, and the general verdict of guilt was proper so long as either theory was proved." *Id*. at 694. Hanson further argued that because subsections (a)(2) and (b) of penal code section 7.02 assign criminal liability, they are offenses. And, because they do not contain the same elements, they are different offenses. *Id*. The *Hanson* court disagreed, stating, "Section 7.02 does not independently define criminal conduct or prescribe punishment therefor. Instead, section 7.02 enumerates the various ways in which a person can be held

14

criminally responsible for another's criminal conduct, as that conduct is defined elsewhere in the code." *Id.* at 694-95.

Here, Gardner was charged with the single offense of aggravated robbery, and the charge authorized conviction on a finding he either assisted Lewis to commit the offense (under section 7.02(a)(2)) or conspired with Lewis, who committed the offense in furtherance of the conspiracy (under section 7.02(b)). We have held the evidence is legally and factually sufficient to establish guilt under either theory. Therefore, jury unanimity with respect to which theory of party liability applied was not necessary, and the general verdict of guilty was proper. *See id.* at 694-95, *see also Goff v. State*, 931 S.W.2d 537, 544-45 (Tex. Crim. App. 1996) (court held jury charge telling jury they could find defendant guilty based on either his own actions or another's actions (liability as a party) not erroneous); *Kitchens v. State*, 823 S.W.2d 256, 257 (Tex. Crim. App. 1991).[3] The second issue is overruled.

*C. Conspiracy Instruction*

In his third issue, Gardner argues the trial court erred by improperly instructing the jury regarding the law of conspiracy. We disagree. Specifically, he complains the court's instruction: "An agreement constituting a conspiracy may be inferred from the acts of the parties" constituted a comment on the weight of the evidence and is a misstatement of the

---

[3]In *Kitchens*, the defendant argued that all twelve jurors had to either find he committed sexual assault or robbery (or both) to convict him of capital murder. The charge included an alternative submission of murder in the course of committing robbery or sexual assault; thus, each juror was allowed to vote guilty if he or she found he committed or attempted to commit either underlying felony. *Kitchens v. State*, 823 S.W.2d 256, 257 (Tex. Crim. App. 1991). The court rejected his argument that the charge concealed a verdict that was not unanimous. *Id.* at 258. The court stated, "It is appropriate where the alternative theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted." *Id.* The court continued that a jury need not agree on the "preliminary factual issues which underlie the verdict." *Id.* (quoting *Schad v. Arizona*, 501 U.S. 624, 651 (1991)).

15

law.[4]

The trial court, in explaining the law of parties under penal code § 7.02(b), instructed the jury as follows:

> [I]n the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.
>
> A person commits criminal conspiracy if, with intent that a felony be committed he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and he or one or more of them performs an overt act in pursuance of the agreement.
>
> *An agreement constituting a conspiracy may be inferred from the acts of the parties.*

(Emphasis added.)

*1. Comment on the Weight of the Evidence*

Article 36.14 of the code of criminal procedure provides that the trial court shall submit a charge that sets forth "the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007). The charge should state the law applicable to the case, without expressing or intimating any opinion about the credibility of the statements made by the party accused or by the witnesses. *Russell v. State*, 749 S.W.2d 77, 78 (Tex. Crim. App. 1988). A comment on the weight of the evidence occurs when the charge "assumes the truth of a controverted issue," *Whaley v.*

---

[4]Defense counsel did not object to the charge on the basis that this instruction is a misstatement of the law.

16

*State*, 717 S.W.2d 26, 32 (Tex. Crim. App. 1986), or appraises the credibility of a particular witness. *Russell*, 749 S.W.2d at 78. Thus, when a court, in its charge, suggests certain evidence is either true or untrue, that is a comment on the weight of the evidence. *Id*. Likewise, an instruction that instructs the jury on the weight to be given certain testimony is error. *Id*. In determining whether an instruction is a comment on the weight of the evidence, courts have assessed the instruction's probable effect on the jury in the context in which it was given. *Id*. at 79.

Here, looking at the complained-of instruction by itself,[5] we find it to be neutral. It does not in and of itself instruct the jury one way or another on how to weigh the evidence, or that certain evidence is either true or untrue, it does not appraise the credibility of a particular witness, and it does not assume the truth of a controverted issue. Further, when read as a part of the whole charge, including the general instruction that the jury is the exclusive judge of the credibility of the witnesses and the weight to be given to their testimony, and when examined in light of the evidence presented at trial, the instruction does not single out a particular piece of evidence for special attention. *See id*. We hold the instruction did not constitute a comment on the weight of the evidence. *See id*. at 78; *Whaley*, 717 S.W.2d at 32.

*2. Misstatement of the Law*

In *Ladd v. State*, the trial court gave the same instruction complained of by Gardner. *See* 3 S.W.3d 547, 565 (Tex. Crim. App. 1999). The *Ladd* court stated, "We discern no error. The Penal Code provides no definition for 'conspiracy' as that term is used in § 7.02(b). Therefore, the trial court need not have defined the term, but it certainly did not

---

[5]*See Russell v. State*, 749 S.W.2d 77, 79 (Tex. Crim. App. 1988).

err in instructing the jury to give the term its commonly understood meaning." *Id*. (citations omitted). Further, subsection (b) of section 15.02 of the penal code (entitled "Criminal Conspiracy") provides: "An agreement constituting a conspiracy may be inferred from acts of the parties." TEX. PENAL CODE ANN. § 15.02(b) (Vernon 2003). We hold that the complained-of instruction is not a misstatement of the law. *See id*. Issue three is overruled.

*D. Submission of the Section 7.02(b) Application Paragraph*

In his fourth issue, Gardner argues that the trial court erred in submitting the section 7.02(b) application paragraph because it misapplied the law to the facts, was vague and ambiguous, failed to link the legal definitions to the application paragraph, and did not contain the elements to sustain a conviction. Counsel did not object to the charge on these bases.

The section 7.02(b) application paragraph stated:

JONATHAN KEITH GARDNER entered into a conspiracy with STEVEN CURTIS LEWIS to commit the felony offense of robbery, and attempted to carry out that conspiracy, and in such attempt the felony of aggravated robbery was committed, and you further find the offense of aggravated robbery was committed in furtherance of the unlawful purpose of committing robbery, and you further find the offense of aggravated robbery should have been anticipated as a result of the carrying out of the conspiracy;

This language tracks the language found in section 7.02(b) of the penal code. *See* TEX. PENAL CODE ANN. § 7.02(b) (Vernon 2003). A jury charge that tracks the language of a particular statute is a proper charge on the statutory issue. *Riddle v. State*, 888 S.W.2d 1, 8 (Tex. Crim. App. 1994). Further, the charge correctly defined conspiracy for the jury. We hold the trial court properly charged the jury pursuant to section 7.02(b). Even if the court committed error, the error would be harmless because, as we have already

determined, the evidence in the record was both legally and factually sufficient under either subsection of section 7.02. *See Hanson*, 55 S.W.3d at 695 (court concluded that "even if the district court did commit error [by submitting 7.02(a)(2) and 7.02(b) application paragraphs disjunctively], the error would be harmless because we have already determined that the evidence in the record was both factually and legally sufficient under either subsection of section 7.02"). Issue four is overruled.

*E. Punishment Charge*

In his fifth issue, Gardner argues the trial court erred by giving a jury instruction about good-conduct time when he was not eligible for the application of this credit to his sentence. He contends that given the fact he is ineligible for good-conduct time, the instruction on the application of good-conduct time was misleading and calculated to cause an improper verdict.

The pertinent portions of the charge, which are statutorily mandated by article 37.07, section 4(a) of the code of criminal procedure,[6] are as follows:

> The Defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

> It is also possible that the length of time of which the Defendant will be imprisoned might be reduced by the award of parole.

---

[6]Article 37.07, section 4(a) requires the trial court to inform the jury about the effects of parole and good conduct time for every noncapital felony listed under TEX. CODE CRIM. PROC. ANN. art. 42.12, § 3g(a) (Vernon Supp. 2008). TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (Vernon Supp. 2008). Giving this instruction is a blanket requirement, regardless of whether the defendant is actually eligible for such time. *Id.*

You will be required to answer a Special Issue[7] whether the Defendant used or exhibited a deadly weapon during the commission of this offense.

If you answer "we do" to the Special Issue, the Defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or thirty (30) years, whichever is less, without consideration of any good conduct time he may earn. Eligibility for parole does not guarantee that parole will be granted.

If you answer "we do not" to the Special Issue, the defendant will not become eligible for parole until the actual time served plus any good conduct time earned equals one-fourth of the sentence imposed. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this Defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular Defendant. You are not to consider the manner in which the parole law may be applied to this particular Defendant.

*1. Standard of Review*

Counsel did not object to these instructions. An unpreserved complaint about charge error is reviewed for "egregious harm." *Almanza v. State*, 686 S.W.2d 157, 171-72 (Tex. Crim. App. 1985) (op. on reh'g). This standard applies to erroneous parole and good-conduct instructions. *Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006); *Jimenez v. State*, 32 S.W.3d 233, 235-39 (Tex. Crim. App. 2000). Egregious harm is a difficult standard that is determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App.2002). Errors that result in egregious harm are those that affect

---

[7]The special issue asked the jury, "Do you find from the evidence beyond a reasonable doubt that the Defendant, JONATHAN KEITH GARDNER, used or exhibited a deadly weapon, to wit: a knife, in the commission of the offense of Aggravated Robbery as alleged in the indictment?" The jury answered, "We do not."

"the very basis of the case," deprive the defendant of a "valuable right," or "vitally affect a defensive theory." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) (citing *Almanza*, 686 S.W.2d at 172). The harm to Gardner must be actual, not just theoretical. *Almanza*, 686 S.W.2d at 174. In deciding whether egregious harm exists, we look at (1) the charge itself, (2) the state of the evidence, including contested issues, (3) the arguments of counsel, and (4) any other relevant information revealed by the record of the trial as a whole. *Hutch*, 922 S.W.2d at 171.

Gardner argues that because the jury found him guilty of aggravated robbery, an enumerated offense under article 42.12, section 3g(a)(1)(F) of the code of criminal procedure, he does not attain parole eligibility until his "actual calendar time served, without consideration of good conduct time, equals one-half of the sentence. . . ." TEX. GOV'T CODE ANN. § 508.145(d) (Vernon Supp. 2008).[8] He raises two complaints about the aforementioned instructions. First, he complains the charge instructed the jury his sentence may be reduced through the award of good-conduct time, which is false because he will not be credited for good-conduct time in terms of calculating his parole eligibility. Second, he argues the charge essentially instructed the jury, that if it answers "we do not" to the Special Issue," he "will not become eligible for parole until the actual time served plus any good conduct time earned equals one-fourth of the sentence imposed," which is

---

[8]Section 508.145(d) of the government code provides that:

> An inmate serving a sentence for an offense described by Section 3g(a)(1)(A), (C), (D), (E), (F), (G), (H), or (I), Article 42.12, Code of Criminal Procedure, or for an offense for which the judgment contains an affirmative finding under Section 3g(a)(2) of that article, is not eligible for release on parole until the inmate's actual calendar time served, without consideration of good conduct time, equals one-half of the sentence or 30 calendar years, whichever is less, but in no event is the inmate eligible for release on parole in less than two calendar years.

TEX. GOV'T CODE ANN. § 508.145(d) (Vernon Supp. 2008).

incorrect because he will not be parole eligible until he served at least one-half of his sentence.

*2. Gardner's First Complaint*

The nature of Gardner's first complaint—that the charge erroneously states that his sentence may be reduced through the award of good-conduct time—arises from the parole and mandatory supervision laws. *See* TEX. GOV'T CODE ANN. ch. 508 (Vernon 1998 & Supp. 2008) (entitled "Parole and Mandatory Supervision"). Gardner becomes parole eligible when he has served the lesser of thirty years or one-half his sentence, and good-conduct time is not to be considered in that calculation. *Id.* at § 508.145(d). If an inmate is not released on parole, he or she may be released on "mandatory supervision" when the inmate's actual time served plus any good-conduct time equals the sentence. *Id.* §§ 508.147, 508.149(b) (Vernon 1998 & Supp. 2008). Gardner is not eligible for mandatory supervision because of his crime–aggravated robbery. *Id.* § 508.149(a)(12) (Vernon Supp. 2008). Thus, good-conduct time has no bearing on his release date under either parole or mandatory supervision. Yet the charge instructed the jury Gardner "may earn time off the period of incarceration through the award of good conduct time," thereby implying that it had some bearing on his release date regardless of how the jury answered the Special Issue. He claims the instruction is erroneous in his case.

Courts of appeals have considered this issue and have concluded that it is not error to give the instruction from article 37.07, section 4(a). *See Alawad v. State*, 57 S.W.3d 24, 26 (Tex. App.–Houston [14th Dist.] 2001, pet. ref'd); *Martinez v. State*, 969 S.W.2d 497, 501 (Tex. App.–Austin 1998, no pet.); *Garcia v. State*, 911 S.W.2d 866, 869 (Tex. App.–El Paso 1995, no pet.). More recently, in *Luquis v. State*, Luquis challenged the trial court's

22

submission of the statutorily mandated parole-law instruction at the punishment stage.  72 S.W.3d 355, 357 (Tex. Crim. App. 2002).  Gardner argued that because he was not eligible for release on mandatory supervision, the court erred in giving the instruction concerning good-conduct time.  *Id*.  His core complaint was that the parole law instruction language concerning good-conduct time is misleading and erroneous because he was not, in fact, eligible for release on mandatory supervision.  *Id*. at 362.  In its analysis, the court of criminal appeals considered:  (1) the instruction in context of the entire charge; (2) whether the record showed the jury discussed, considered, or tried to apply what they were told about good-conduct time and parole; (3) that the record did not give any indication, such as a jury note, that the jury was confused about the possible application of good-conduct time in the case; and (4) the punishment the jury assessed.  *Id*. at 366-67.  The court of criminal appeals concluded that Luquis had not shown that the instruction "was calculated to mislead this jury or that there is a reasonable probability that it did mislead this jury."  *Id*. at 367.  Therefore, the trial court did not err in submitting the instruction.  *Id*. at 368.

*Application of Luquis factors*

### 1. The Instruction in the Context of the Entire Charge

The instruction did inform the jury, in accordance with the statute, that they were not to consider the manner in which the parole law may be applied to Gardner.  We, like the *Luquis* court, assume the jury followed this instruction.  *See id*. at 366.

### 2. Whether the Record Showed the Jury Discussed, Considered, or Tried to Apply What They Were Told About Good-Conduct Time & Parole

Nothing in the record suggests the jury discussed, considered, or tried to apply (despite the judicial admonition not to apply) what it was told about good-conduct time and parole.  The prosecutor did not urge the jury to assess a greater sentence based upon any

potential good-conduct time credits.

### 3. Whether the Record Gave Any Indication the Jury Was Confused About the Application of Good-Conduct Time

The jury did not send out any notes indicating or expressing confusion about the possible application of good-conduct time to Gardner. Further, the record does not include any affidavits from jurors showing they were confused about the application of good-conduct time to him.

### 4. Punishment Assessed

Aggravated robbery is a first-degree felony[9] punishable by five to ninety-nine years or life in prison, plus a fine not to exceed $10,000. TEX. PENAL CODE ANN. § 12.31(a), (b) (Vernon 2003). The prosecutor, during closing argument at the punishment stage, told the jury, "I'm not going to sit here and ask you to send him away for life. . . . I might think that around 20 or 25 would be a fair number." Despite this argument, the jury assessed a twelve-year sentence, plus a $10,000 fine. Considering the crime, Gardner's role in it, and his prior criminal history, the sentence falls within the low end of the punishment range.

After applying the *Luquis* factors, we hold the instruction was neither misleading nor was it calculated to cause an improper verdict. *See Luquis*, 72 S.W.3d at 367.

### 3. Gardner's Second Complaint

The nature of Gardner's second complaint—the charge incorrectly instructed the jury he would be parole eligible after serving one-fourth of his sentence—stems from the required deadly weapon finding. The required deadly weapon finding mandated the court instruct the jury that Gardner would not become parole eligible until the actual time served equals the lesser of one-half of the sentence imposed or thirty years, without consideration

---

[9] TEX. CODE CRIM. PROC. ANN. art. 29.03(b) (Vernon 2003).

of any good-conduct time. The erroneous charge instructed the jury that Gardner "will not become eligible for parole until the actual time served plus any good conduct time earned equals one-fourth of the sentence imposed."

The argument that egregious harm exists in this situation is that, based on the erroneous instruction, the jury, in assessing a twelve-year sentence, thought Gardner would have to serve at least one-fourth of the imposed sentence, or three years, but he actually must serve at least one-half, or six years. As a result, the jury might have assessed a greater punishment, which would mean Gardner must actually serve a longer sentence than the jury would have assessed had the court given them the correct instruction.

Several cases have addressed egregious harm in the context of a punishment charge containing errors and omissions in the parole and good-conduct instructions. Several common threads run among those cases. The first factor to consider is the presumption the jury followed the charge's instructions. *See Luquis*, 72 S.W.3d at 366; *Parker v State*, 119 S.W.3d 350, 357 (Tex. App.–Waco 2003, pet. ref'd); *Newman v. State*, 49 S.W.3d 577, 581 (Tex. App.–Beaumont 2001, pet. ref'd). Thus, we presume the jury followed the court's instruction[10] and did not consider parole. *See Shavers v. State*, 985 S.W.2d 284, 291 (Tex. App.–Beaumont 1999, pet. ref'd); *Williams v. State*, 975 S.W.2d 375, 378 (Tex. App.–Waco 1998, pet. ref'd). Absent evidence or indications to the contrary, this presumption prevails. *Shavers*, 985 S.W.2d at 291; *Love v. State*, 909 S.W.2d 930, 935 (Tex. App.–El Paso 1995, pet. ref'd); *Clayton v. State*, 767 S.W.2d 504,

---

[10]In this case, the trial court instructed the jury: "However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant [Gardner]. You are not to consider the manner in which the parole law may be applied to this particular defendant."

25

506 (Tex. App.–Amarillo 1989, pet. ref'd).

When there is a note from the jury regarding parole or good-conduct time, courts are more prone to find egregious harm. *See, e.g., Villarreal v. State*, 205 S.W.3d 103, 107-10 (Tex. App.–Texarkana 2006, pet. dism'd); *Rogers v. State*, 38 S.W.3d 725, 728-29 (Tex. App.–Texarkana 2001, pet. ref'd); *Ramos v. State*, 831 S.W.2d 10, 17-18 (Tex. App.–El Paso 1992, pet. ref'd).

Another factor is the State's emphasis in argument on the possibility of parole. *See, e.g., Rogers*, 38 S.W.3d at 730. And, courts also sometimes consider the assessment of a high or maximum sentence. *See, e.g., Villarreal*, 205 S.W.3d at 109-10; *Rogers*, 38 S.W.3d at 730.

Courts generally agree that the parole instruction was designed to favor the State and to increase sentences. *See Arnold v. State*, 786 S.W.2d 295, 300 (Tex. Crim. App. 1990); *Williams*, 975 S.W.2d at 378; *Myres v. State*, 866 S.W.2d 673, 674 (Tex. App.–Houston [1st Dist.] 1993, pet. ref'd); *Grigsby v. State*, 833 S.W.2d 573, 576 (Tex. App.–Dallas 1992, pet. ref'd). But it can help the defendant because the jury could learn that the defendant would serve longer than it expected and could be influenced to assess less time. *Williams*, 975 S.W.2d at 378 (citing *Myres*, 866 S.W.2d at 674).

A case similar to Gardner's is *Igo v. State*, 210 S.W.3d 645 (Tex. Crim. App. 2006). In that case, at the punishment stage of Igo's trial for sexual assault, the court erroneously instructed the jury that he would not become parole eligible until the actual time served, plus good time, equaled one-fourth of the sentence imposed. *Id*. at 646. The court should have instructed the jury Igo would not become parole eligible until the actual time served, without considering good time, equaled one-half of the sentence imposed. *Id*. Igo did not

26

object to the charge, and he received the maximum sentence. *Id*. at 646-47. Finding no egregious harm, the court of criminal appeals stated:

> First, the parole instruction contained the standard curative language admonishing the jury not to consider the extent to which the parole law might be applied to the defendant. Second, parole was not mentioned by either counsel during argument on punishment. And finally, the evidence relating to punishment was exceptionally strong.

*Id*. at 647.

Here, there is no indication that the jury improperly considered the effect of parole or good-conduct time. The punishment range was five to ninety-nine years or life, and the twelve-year sentence is not extreme, given Gardner's two prior felony convictions along with the fact that Mills received a serious stab wound during the incident. The prosecutor did not urge the jury to calculate Gardner's sentence from the parole instructions. There was no indication that the jury failed to follow the instruction to not consider the extent to which parole or good-conduct time may affect Gardner. We can acknowledge by speculation that the jury may have calculated that Gardner would have to serve three years before he could be released, but speculation leads only to theoretical harm, rather than actual harm. *Almanza*, 686 S.W.2d at 174 (harm must be actual, not just theoretical); *Curry v. State*, 222 S.W.3d 745, 753 (Tex. App.–Waco 2007, pet. ref'd).

Considering the record as a whole, we hold that the erroneous parole and good-conduct instructions did not prevent Gardner from receiving a fair and impartial trial or cause egregious harm. *See Igo*, 210 S.W.3d at 647-48; *Williams*, 975 S.W.2d at 378. Issue five is overruled.

## III. Conclusion

Having overruled all of Gardner's issues, we affirm the trial court's judgment.


ROSE VELA
Justice


Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this 2nd day of October, 2008.