NUMBER 13-07-446-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


JONATHAN KEITH GARDNER, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 163rd District Court 

of Orange County, Texas

 


MEMORANDUM OPINION

 

Before Justices Rodriguez, Garza, and Vela


Memorandum Opinion by Justice Vela




 A jury found appellant, Jonathan Keith Gardner, guilty of aggravated robbery (1) and
assessed his punishment at twelve years in prison, plus a $10,000 fine. In five issues,
Gardner challenges the legal and factual sufficiency of the evidence to support his
conviction and complains of charge error. We affirm. 

I. Factual Background


A. State's Evidence

 On the morning of November 2, 2006, Rosemary Pollard went to the home of
Ronald Mills, Jr., in Orange, Texas, and told Horace Lesiene she wanted to talk to Mills. 
Lesiene told Pollard that Mills did not want to talk to her. After Lesiene left Mills's house,
Mills saw Pollard in his garage. She told Mills she had left her purse in his house. Mills
let her inside, and while they looked for the purse, Gardner and Steven Lewis came into
Mills's kitchen. When Mills saw them in the kitchen, both told him, "'This is a robbery,
fool.'" Gardner tried to knock Mills out by hitting him with pots and pans. He also wanted
to tie up Mills with a phone cord. While Mills fought Lewis, Gardner took knives from the
kitchen table, and both men tried to stab Mills with the knives. Gardner told Mills, "'Give
us your money. We're going to kill you.'" Lewis grabbed a butcher knife from the kitchen
sink and plunged it into Mills's stomach. Mills testified that because he "was losing so
much blood" he stopped fighting. When the prosecutor asked him, "So what did they take
out of the kitchen?", he said, "[J]ust laptop computers." He said that money was also
taken. 

 Mills underwent surgery to repair the stab wound to his stomach. He spent about
three and one-half weeks in the hospital. Mills did not give any of the three permission to
come into his house and steal his property.

 At the time of the robbery, Ronald Preston, who was in a parked vehicle, saw an
Explorer park near his vehicle. Three individuals, Gardner, another man, and a woman,
got out of the Explorer and went into a house. A short time later, Preston saw two of them,
"Mr. Lewis" and "Ms. Rosemary," leave the house and get in the Explorer. He did not see
Gardner get into the Explorer. After the Explorer left, the police arrived at the scene.

 When Officer Kelli Griffin arrived at Mills's home, Mills told her that "Rosemary
knocked on his door . . . . [H]e answered the door, [and] she started asking him questions
about where a house was. Mills said while he was trying to explain where this house was,
two other males entered the residence." Mills told Officer Griffin that he had been
attacked. Officer Griffin, a former paramedic, testified that because of the amount of blood
she saw at the scene, she felt Mills's injury could have been life threatening. She saw a
bloody butcher knife inside Mills's garage, and she found a steak knife on his driveway. 
When the prosecutor asked Officer Griffin, "[D]o you believe that if this [butcher] knife were
thrust into someone's abdomen, that it could cause serious bodily injury or possibly
death?", she replied, "Yes." When the prosecutor asked her, "So, in your opinion, would
this [butcher] knife be considered a deadly weapon?", she replied, "Yes, in my opinion, I
do." On cross-examination, Officer Griffin said that Mills did not tell her that Rosemary
Pollard had said anything about leaving her purse at his house.

 Gardner, Lewis, and Pollard gave Detective Sarah Jefferson-Simon statements
about their involvement in the incident. During the guilt-innocence stage, she read the
statements to the jury. In his statement, Gardner said he had picked up Pollard and Lewis
and that Pollard wanted to go to Mills's house to get "dope." Upon arrival, Pollard went to
Mills's garage. About ten minutes later, she waved for Gardner and Lewis to come to the
garage. Lewis got out and told Gardner that he was "going to get some dope." Gardner
drove around the block a couple of times, went to Mills's door, and saw Mills "swinging at
Bobo [Lewis] because Bobo had a knife in one hand and a screwdriver in the other." Lewis
was asking Mills where the dope was. Gardner went into the house, asked Mills where the
drugs were, and hit Mills with his fist. After they left Mills's house, Pollard gave Gardner
$300. He said Lewis told him that he had stabbed Mills.

 Pollard's statement reflects that she, Gardner, and Lewis went to Mills's house to
buy marihuana and that Gardner and Lewis attacked Mills, hitting him with their fists. 
Lewis asked Mills where the money was. Mills told him he had $300 and that they could
take it. Pollard grabbed the money and took a camera. She said Gardner took Mills's
laptop computer. She saw Gardner hit Mills twice with a steel pot. When they got in the
truck, Lewis said that he had "cut Mr. Mills."

 In his statement, Lewis stated that he, Pollard, and Gardner went to Mills's house
to buy marihuana. When Lewis gave Mills five dollars, Mills "went to tripping and swung
off from me, and I swung back at him, and the fight ensued." Mills grabbed a knife, and
during the fight, Mills "some kind of way" "got stabbed, and once that happened, everybody
left the house, because Ronald [Mills] was hollering." Lewis said that he left on foot and
that the others left in the truck. He later met with Pollard and Gardner at which time Pollard
gave them each $100. 

B. Defense Evidence

 Gardner testified that at the time in question, he, Lewis, and Pollard went to Mills's
house for the purpose of getting some blunts (marihuana rolled up in a cigar). Upon
arrival, Pollard went into the house and then returned, telling them Mills did not have any
marihuana. Lewis decided to ask Mills himself and went into the house. About two
minutes later, he and Pollard went to the house and saw Mills and Lewis "tussling." Mills
was "swinging his hands" and Lewis "was going at him like this with a knife." Gardner
testified that "When I stepped in, Mr. Mills, he seen me, and he hit me upside my head,
and out of reflex, I struck him out. I admit, I did hit the man." Gardner left after he saw
what was going on. He denied any involvement in the robbery. He said that he and
Pollard left in the vehicle and that Pollard gave him about $300. Gardner testified that after
the incident, he "hauled tail" and went to Beaumont.

 Gardner testified that he had two felony convictions, one for delivery of a controlled
substance and the other for unauthorized use of a motor vehicle.

 Neither Lewis nor Pollard testified at trial.

II. Discussion


A. Sufficiency of the Evidence

 In his first issue, Gardner challenges the legal and factual sufficiency of the
evidence to support his conviction. In reviewing the legal sufficiency of the evidence, we
view all the evidence in the light most favorable to the verdict in order to determine whether
any rational trier of fact could have found the essential elements of the crime beyond a
reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Hampton v. State, 165
S.W.3d 691, 693 (Tex. Crim. App. 2005). This standard gives full play to the responsibility
of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts. Jackson, 443 U.S. at 319. The
trier of fact is the sole judge of the weight and credibility of the evidence. Tex. Code Crim.
Proc. Ann. art. 38.04 (Vernon 1979); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim.
App. 2000). Thus, when performing a legal-sufficiency review, we may not re-evaluate the
weight and credibility of the evidence and substitute our judgment for that of the fact-finder. 
Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any
inconsistencies in the evidence in favor of the judgment. Curry v. State, 30 S.W.3d 394,
406 (Tex. Crim. App. 2000).

 In reviewing a factual sufficiency claim, we review the evidence in a neutral light
rather than the light most favorable to the verdict. Neal v. State, 256 S.W.3d 264, 275
(Tex. Crim. App. 2008); Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007)
(citing Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000)). Evidence is factually
insufficient if the evidence supporting the verdict is so weak that the verdict seems clearly
wrong and manifestly unjust, or if the supporting evidence is outweighed by the great
weight and preponderance of the contrary evidence so as to render the verdict clearly
wrong and manifestly unjust. Neal, 256 S.W.3d at 275; Roberts, 220 S.W.3d at 524 (citing
Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). We do not reverse for
factual insufficiency if the greater weight and preponderance of the evidence actually
favors conviction. Neal, 256 S.W.3d at 275; Roberts, 220 S.W.3d at 524 (citing Watson,
204 S.W.3d at 417).

1. The Charge

 In this case, the jury could convict Gardner of aggravated robbery if they believed
from the evidence beyond a reasonable doubt that on or about November 2, 2006, in
Orange County, Texas either:

 STEVEN CURTIS LEWIS, did then and there, while in the course of
committing theft and with intent to obtain and maintain control of property of
Ronald Mills, Jr., without the effective consent of the said Ronald Mills, Jr.,
and with intent to deprive the said Ronald Mills, Jr., of said property, did then
and there by using or exhibiting a deadly weapon, to wit: a knife, that in the
manner of its use and intended use is capable of causing serious bodily
injury or death, intentionally or knowingly cause bodily injury to Ronald Mills,
Jr., by stabbing the said Ronald Mills, Jr., with said knife, and JONATHAN
KEITH GARDNER, acting with the intent to promote or assist in the
commission of the offense of aggravated robbery, aided or attempted to aid
STEVEN CURTIS LEWIS to commit the offense of aggravated robbery;


 OR


 JONATHAN KEITH GARDNER entered into a conspiracy with STEVEN
CURTIS LEWIS to commit the felony offense of robbery, and attempted to
carry out that conspiracy, and in such attempt the felony of aggravated
robbery was committed, and you further find the offense of aggravated
robbery was committed in furtherance of the unlawful purpose of committing
robbery, and you further find the offense of aggravated robbery should have
been anticipated as a result of the carrying out of the conspiracy[.]

2. Elements of Aggravated Robbery

 Section 29.02(a)(2) of the penal code defines robbery as follows: "A person
commits an offense if, in the course of committing theft . . . and with intent to obtain or
maintain control of the property, he . . . intentionally or knowingly threatens or places
another in fear or imminent bodily injury or death." Tex. Penal Code Ann. § 29.02(a)(2)
(Vernon 2003). The offense becomes aggravated if the person "uses or exhibits a deadly
weapon." Id. § 29.03(a)(2). The phrase, "'In the course of committing theft'" is defined as
"conduct that occurs in an attempt to commit, during the commission, or in immediate flight
after the attempt or commission of theft." Id. § 29.01(1). A person is guilty of an attempted
offense "if, with specific intent to commit an offense, he does an act amounting to more
than mere preparation that tends but fails to effect the commission of the offense
intended." Id. § 15.01(a).

3. Knife as a Deadly Weapon

 Section 1.07(a)(17)(B) of the penal code defines deadly weapon as: "anything that
in the manner of its use or intended use is capable of causing death or serious bodily
injury." Tex. Penal Code Ann. § 1.07(a)(17)(B) (Vernon Supp. 2008). Regarding this
section's meaning, the court of criminal appeals has stated: "The provision's plain
language does not require that the actor actually intend death or serious bodily injury; an
object is a deadly weapon if the actor intends a use of the object in which it would be
capable of causing death or serious bodily injury." Bailey v. State, 38 S.W.3d 157, 159
(Tex. Crim. App. 2001) (quoting McCain v. State, 22 S.W.3d 497, 503 (Tex. Crim. App.
2000)).

 A knife is not a deadly weapon per se, (2) and in this case, the jury was instructed that
a deadly weapon is "anything that in the manner of its use or intended use is capable of
causing death or serious bodily injury." See Tex. Penal Code Ann. § 1.07(a)(17)(B)
(defining a deadly weapon); McCain, 22 S.W.3d at 503 (holding that "the mere carrying of
a butcher knife during such a violent attack as occurred in . . . [that] case was legally
sufficient for a factfinder to conclude that the 'intended use' for the knife was that it be
capable of causing death or serious bodily injury"). Factors to consider in determining
whether a knife was capable of causing death or serious bodily injury include (1) the knife's
dimensions, (2) the nature of the wounds it inflected, (3) the manner of its use, (4)
testimony of its life-threatening capabilities, (5) the physical proximity between the victim
and the knife; and (6) the words spoken by the defendant. See, e.g., Thomas v. State, 821
S.W.2d 616, 619 (Tex. Crim. App. 1991); Tisdale v. State, 686 S.W.2d 110, 115 (Tex.
Crim. App. 1984) (op. on reh'g); Lowe v. State, 211 S.W.3d 821, 828 (Tex.
App.-Texarkana 2006, pet. ref'd).

4. Law of Parties

 The charge authorized Gardner's conviction as a party to aggravated robbery
pursuant to penal code section 7.02(a)(2) or (b).

a. Section 7.02(a)(2)

 Section 7.02(a)(2) states that: "(a) A person is criminally responsible for an offense
committed by the conduct of another if: . . . "(2) acting with intent to promote or assist the
commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the
other person to commit the offense[.]" Tex. Penal Code Ann. § 7.02(a)(2) (Vernon 2003). 
Thus, in order to convict Gardner of aggravated robbery under section 7.02(a)(2), the State
had to prove that he aided and abetted Lewis with respect to each element of the offense. 
Woods v. State, 749 S.W.2d 246, 248 (Tex. App.-Fort Worth 1988, no pet.).

b. Legal & Factual Sufficiency of the Evidence to Support Conviction Under 7.02(a)(2)


 "Evidence is sufficient to support a conviction under the law of parties where the
actor is physically present at the commission of the offense, and encourages the
commission of the offense either by words or other agreement." Burdine v. State, 719
S.W.2d 309, 315 (Tex. Crim. App. 1986); Cordova v. State, 698 S.W.2d 107, 111 (Tex.
Crim. App. 1985). The evidence must show that at the time of the offense, the parties
were acting together, each contributing some part towards the execution of their common
purpose. Burdine, 719 S.W.2d at 315. In determining whether a defendant participated
in an offense as a party, the court may examine the events occurring before, during, and
after the commission of the crime and may rely on the defendant's actions that show an
understanding and common design to commit the crime. Burdine, 719 S.W.2d at 315;
Cordova, 698 S.W.2d at 111; Beier v. State, 687 S.W.2d 2, 4 (Tex. Crim. App. 1985).

c. Analysis

 A rational jury could have determined the following from the evidence that: (1)
Gardner and Lewis came into Mills's home, and both told him, "This is a robbery, fool"; (2)
Gardner tried to knock out Mills and wanted to tie him up; (3) while Mills fought Lewis,
Gardner found some knives, and both men tried to stab Mills; (4) Gardner asked Mills for
money and told him they were going to kill him; (5) Lewis stabbed Mills in the stomach with
a butcher knife; (6) the men took a laptop computer from Mills's kitchen; (7) Mills did not
give Gardner, Lewis, or Pollard permission to take his property; (8) because of the amount
of blood that she saw, Officer Griffin felt that Mills's injury could have been life threatening;
(9) Officer Griffin considered the butcher knife a deadly weapon; (10) Mills had surgery to
repair the stab wound caused by the butcher knife; and (11) Gardner, Lewis, and Pollard
fled the scene after the robbery, and Gardner went to Beaumont.

 The contrary evidence showed that: (1) according to Gardner's testimony, he had
no involvement in the robbery; (2) Gardner did not plan with anyone to rob Mills; (3) Mills
testified Pollard came to his house for her purse, but Officer Griffin testified Mills did not
say anything about Pollard coming to his house for her purse; (4) Gardner took Pollard to
Mills's house so she could get some "dope" or "blunts"; and, (5) Gardner did not stab Mills.

 Viewing the evidence in the light most favorable to the verdict, we hold there was
legally sufficient evidence to find Gardner guilty as a party under section 7.02(a)(2). The
evidence showed beyond a reasonable doubt that: (1) the butcher knife used by Lewis to
stab Mills in the stomach was, in the manner of its use and intended use, capable of
causing death or serious bodily injury and, thus, a deadly weapon; (2) that in the course
of committing theft and with the intent to obtain or maintain control of property, Lewis
intentionally or knowingly threatened or placed Mills in fear of imminent bodily injury or
death by using or exhibiting the butcher knife as a deadly weapon; and (3) that Gardner
acted with the intent to promote or assist Lewis's commission of aggravated robbery, and
he aided or attempted to aid Lewis by telling Mills they were there to rob him, trying to
knock him out, wanting to tie him up, trying to stab him, and taking Mills's laptop computer.

 Viewing the evidence neutrally, we conclude that the evidence is not so contrary to
the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust or that
the proof of guilt is against the great weight and preponderance of the evidence. See
Watson, 204 S.W.3d at 414-15, 417; Johnson, 23 S.W.3d at 11. Accordingly, we hold that
the evidence is legally and factually sufficient to support Gardner's conviction as a party
under section 7.02(a)(2). 

d. Section 7.02(b)

 Under penal code section 7.02(b), a person is criminally responsible for an offense
committed by the conduct of another if:

 [I]n the attempt to carry out a conspiracy to commit one felony,
another felony is committed by one of the conspirators, all conspirators are
guilty of the felony actually committed, though having no intent to commit it,
if the offense was committed in furtherance of the unlawful purpose and was
one that should have been anticipated as a result of the carrying out of the
conspiracy.


Tex. Penal Code Ann. § 7.02(b) (Vernon 2003).

 A conspiracy exists when two or more persons as shown by words or deeds agree
to do an unlawful act. Butler v. State, 758 S.W.2d 856, 860 (Tex. App.-Houston [14th
Dist.] 1988, no pet.). An agreement may be inferred from the parties' acts, Snow v. State,
721 S.W.2d 943, 948 (Tex. App.-Houston [1st Dist.] 1986, no pet.), and the State may
prove conspiracy by circumstantial evidence. Butler, 758 S.W.2d at 860. The agreement
must be before or contemporaneous with the criminal event. Beier v. State, 687 S.W.2d
2, 4 (Tex. Crim. App. 1985). While an agreement of the parties to act together in a
common design seldom can be proven by direct evidence; reliance, therefore, may be
placed upon the actions of parties, showing by either direct or circumstantial evidence an
understanding and common design to do a certain act. Rivera v. State, 990 S.W.2d 882,
887 (Tex. App.-Austin 1999, pet. ref'd), see Burdine, 719 S.W.2d at 315.

e. Legal & Factual Sufficiency of the Evidence to Support a Conviction Under 7.02(b)


 Notwithstanding conflicting evidence, the jury was free to conclude Gardner
conspired with Lewis to commit the robbery of Mills. Burdine, 719 S.W.2d at 314. The
evidence established an implicit agreement between Gardner and Lewis to rob Mills. After
Gardner and Lewis entered Mills's house, both of them told Mills, "'This is a robbery, fool.'" 
Gardner tried to knock out Mills and wanted to tie him up. Gardner grabbed knives from
the kitchen table, and both men tried to stab Mills. When neither could subdue him, Lewis
stabbed Mills in the stomach with a butcher knife. After that, Gardner helped Lewis take
Mills's property. Gardner fled the scene and then "hauled tail" to Beaumont.

 Viewing the evidence in the light most favorable to the verdict, we hold the jury could
find beyond a reasonable doubt: Gardner and Lewis entered into a conspiracy to rob Mills
and attempted to carry out that conspiracy; in such attempt, the offense of aggravated
robbery was committed in furtherance of the unlawful purpose of committing robbery; and
Gardner should have anticipated the aggravated robbery as a result of the carrying out of
the conspiracy. The jury, therefore, was free to conclude that Gardner conspired with
Lewis to commit the robbery of Mills and that each of them were "contributing some part
towards the execution of their common purpose." See Burdine, 719 S.W.2d at 314; Snow,
721 S.W.2d at 949.

 Viewing the evidence neutrally, we conclude the evidence is not so contrary to the
overwhelming weight of the evidence as to be clearly wrong or manifestly unjust or that the
proof of guilt is against the great weight and preponderance of the evidence. See Watson,
204 S.W.3d at 414-15, 417; Johnson, 23 S.W.3d at 11. Accordingly, we hold that the
evidence is legally and factually sufficient to support Gardner's conviction as a party under
section 7.02(b). Issue one is overruled.

B. Jury Unanimity

 In his second issue, Gardner argues the trial court, over counsel's objection, erred
in disjunctively submitting the case to the jury without requiring the jury to unanimously
agree on which subsection--7.02(a)(2) or 7.02(b)--of the penal code was applicable to
him. The charge authorized the jury to convict Gardner of aggravated robbery if the jury
found he either assisted Lewis to commit aggravated robbery (section 7.02(a)(2)) or
conspired with Lewis, who committed aggravated robbery in furtherance of the conspiracy
(section 7.02(b)).

 In reviewing the charge, we must first decide whether error exists. Middleton v.
State, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). If we find error, we must perform a
harm analysis. Id. 

 The Texas Constitution includes a due course of law protection along with the
requirement that only a unanimous jury may convict a defendant charged with a felony. 
See Tex. Const. art. I, § 19, art. V, § 13; see also Tex. Code Crim. Proc. Ann. art.
36.29(a) (Vernon Supp. 2008). The Sixth Amendment guarantees a right to trial by jury
while the Fourteenth Amendment contains due process protections, which the Supreme
Court has determined require juries to find every element of a charged offense beyond a
reasonable doubt. See U.S. Const. amends. VI, XIV; In re Winship, 397 U.S. 358, 364
(1970). The penal code also requires that "no person may be convicted of an offense
unless each element of the offense is proved beyond a reasonable doubt." Tex. Penal
Code Ann. § 2.01 (Vernon 2003).

 Therefore, if a person is charged with two different offenses, a jury may only convict
the person of both offenses if the jury unanimously agrees the State has proven every
element of each offense beyond a reasonable doubt. Hanson v. State, 55 S.W.3d 681,
693 (Tex. App.-Austin 2001, pet. ref'd). When a defendant is tried for two different and
separate offenses, a general jury charge including both offenses submitted in the
disjunctive would be inappropriate. Id.

 This rule, however, does not apply to alternate methods or means by which an
accused is charged with committing the one-charged offense. In Hanson v. State, Hanson
was charged with the single offense of capital murder, and the charge authorized
conviction on a finding that he either assisted another to commit the offense (under section
7.02(a)(2)) or conspired with another who committed the offense in furtherance of the
conspiracy (under section 7.02(b)). Id. at 694. Like the charge in the case before this
Court, the charge in Hanson was submitted in two separate application paragraphs joined
by "or." See id. at 693. The Hanson court stated, "The two alternate theories of party
liability were merely alternate methods or means by which [Hanson] committed the one
charged offense. Jury unanimity as to which theory of party liability applied was not
necessary, and the general verdict of guilt was proper so long as either theory was proved." 
Id. at 694. Hanson further argued that because subsections (a)(2) and (b) of penal code
section 7.02 assign criminal liability, they are offenses. And, because they do not contain
the same elements, they are different offenses. Id. The Hanson court disagreed, stating,
"Section 7.02 does not independently define criminal conduct or prescribe punishment
therefor. Instead, section 7.02 enumerates the various ways in which a person can be held
criminally responsible for another's criminal conduct, as that conduct is defined elsewhere
in the code." Id. at 694-95.

 Here, Gardner was charged with the single offense of aggravated robbery, and the
charge authorized conviction on a finding he either assisted Lewis to commit the offense
(under section 7.02(a)(2)) or conspired with Lewis, who committed the offense in
furtherance of the conspiracy (under section 7.02(b)). We have held the evidence is legally
and factually sufficient to establish guilt under either theory. Therefore, jury unanimity with
respect to which theory of party liability applied was not necessary, and the general verdict
of guilty was proper. See id. at 694-95, see also Goff v. State, 931 S.W.2d 537, 544-45
(Tex. Crim. App. 1996) (court held jury charge telling jury they could find defendant guilty
based on either his own actions or another's actions (liability as a party) not erroneous);
Kitchens v. State, 823 S.W.2d 256, 257 (Tex. Crim. App. 1991). (3) The second issue is
overruled.

C. Conspiracy Instruction

 In his third issue, Gardner argues the trial court erred by improperly instructing the
jury regarding the law of conspiracy. We disagree. Specifically, he complains the court's
instruction: "An agreement constituting a conspiracy may be inferred from the acts of the
parties" constituted a comment on the weight of the evidence and is a misstatement of the
law. (4) 

 The trial court, in explaining the law of parties under penal code § 7.02(b), instructed
the jury as follows:

 [I]n the attempt to carry out a conspiracy to commit one felony,
another felony is committed by one of the conspirators, all conspirators are
guilty of the felony actually committed, though having no intent to commit it,
if the offense was committed in furtherance of the unlawful purpose and was
one that should have been anticipated as a result of the carrying out of the
conspiracy.

 

 A person commits criminal conspiracy if, with intent that a felony be
committed he agrees with one or more persons that they or one or more of
them engage in conduct that would constitute the offense and he or one or
more of them performs an overt act in pursuance of the agreement.


 An agreement constituting a conspiracy may be inferred from the acts
of the parties.


(Emphasis added.)

1. Comment on the Weight of the Evidence

 Article 36.14 of the code of criminal procedure provides that the trial court shall
submit a charge that sets forth "the law applicable to the case; not expressing any opinion
as to the weight of the evidence, not summing up the testimony, discussing the facts or
using any argument in his charge calculated to arouse the sympathy or excite the passions
of the jury." Tex. Code Crim. Proc. Ann. art. 36.14 (Vernon 2007). The charge should
state the law applicable to the case, without expressing or intimating any opinion about the
credibility of the statements made by the party accused or by the witnesses. Russell v.
State, 749 S.W.2d 77, 78 (Tex. Crim. App. 1988). A comment on the weight of the
evidence occurs when the charge "assumes the truth of a controverted issue," Whaley v.
State, 717 S.W.2d 26, 32 (Tex. Crim. App. 1986), or appraises the credibility of a particular
witness. Russell, 749 S.W.2d at 78. Thus, when a court, in its charge, suggests certain
evidence is either true or untrue, that is a comment on the weight of the evidence. Id. 
Likewise, an instruction that instructs the jury on the weight to be given certain testimony
is error. Id. In determining whether an instruction is a comment on the weight of the
evidence, courts have assessed the instruction's probable effect on the jury in the context
in which it was given. Id. at 79.

 Here, looking at the complained-of instruction by itself, (5) we find it to be neutral. It
does not in and of itself instruct the jury one way or another on how to weigh the evidence,
or that certain evidence is either true or untrue, it does not appraise the credibility of a
particular witness, and it does not assume the truth of a controverted issue. Further, when
read as a part of the whole charge, including the general instruction that the jury is the
exclusive judge of the credibility of the witnesses and the weight to be given to their
testimony, and when examined in light of the evidence presented at trial, the instruction
does not single out a particular piece of evidence for special attention. See id. We hold
the instruction did not constitute a comment on the weight of the evidence. See id. at 78;
Whaley, 717 S.W.2d at 32.

2. Misstatement of the Law

 In Ladd v. State, the trial court gave the same instruction complained of by Gardner. 
See 3 S.W.3d 547, 565 (Tex. Crim. App. 1999). The Ladd court stated, "We discern no
error. The Penal Code provides no definition for 'conspiracy' as that term is used in §
7.02(b). Therefore, the trial court need not have defined the term, but it certainly did not
err in instructing the jury to give the term its commonly understood meaning." Id. (citations
omitted). Further, subsection (b) of section 15.02 of the penal code (entitled "Criminal
Conspiracy") provides: "An agreement constituting a conspiracy may be inferred from acts
of the parties." Tex. Penal Code Ann. § 15.02(b) (Vernon 2003). We hold that the
complained-of instruction is not a misstatement of the law. See id. Issue three is
overruled.

D. Submission of the Section 7.02(b) Application Paragraph


 In his fourth issue, Gardner argues that the trial court erred in submitting the section
7.02(b) application paragraph because it misapplied the law to the facts, was vague and
ambiguous, failed to link the legal definitions to the application paragraph, and did not
contain the elements to sustain a conviction. Counsel did not object to the charge on these
bases.

 The section 7.02(b) application paragraph stated:

 JONATHAN KEITH GARDNER entered into a conspiracy with STEVEN
CURTIS LEWIS to commit the felony offense of robbery, and attempted to
carry out that conspiracy, and in such attempt the felony of aggravated
robbery was committed, and you further find the offense of aggravated
robbery was committed in furtherance of the unlawful purpose of committing
robbery, and you further find the offense of aggravated robbery should have
been anticipated as a result of the carrying out of the conspiracy;


 This language tracks the language found in section 7.02(b) of the penal code. See
Tex. Penal Code Ann. § 7.02(b) (Vernon 2003). A jury charge that tracks the language of
a particular statute is a proper charge on the statutory issue. Riddle v. State, 888 S.W.2d
1, 8 (Tex. Crim. App. 1994). Further, the charge correctly defined conspiracy for the jury. 
We hold the trial court properly charged the jury pursuant to section 7.02(b). Even if the
court committed error, the error would be harmless because, as we have already
determined, the evidence in the record was both legally and factually sufficient under either
subsection of section 7.02. See Hanson, 55 S.W.3d at 695 (court concluded that "even
if the district court did commit error [by submitting 7.02(a)(2) and 7.02(b) application
paragraphs disjunctively], the error would be harmless because we have already
determined that the evidence in the record was both factually and legally sufficient under
either subsection of section 7.02"). Issue four is overruled.

E. Punishment Charge

 In his fifth issue, Gardner argues the trial court erred by giving a jury instruction
about good-conduct time when he was not eligible for the application of this credit to his
sentence. He contends that given the fact he is ineligible for good-conduct time, the
instruction on the application of good-conduct time was misleading and calculated to cause
an improper verdict.

 The pertinent portions of the charge, which are statutorily mandated by article 37.07,
section 4(a) of the code of criminal procedure, (6) are as follows:

 The Defendant, if sentenced to a term of imprisonment, may earn time
off the period of incarceration imposed through the award of good conduct
time. Prison authorities may award good conduct time to a prisoner who
exhibits good behavior, diligence in carrying out prison work assignments,
and attempts at rehabilitation. If a prisoner engages in misconduct, prison
authorities may also take away all or part of any good conduct time earned
by the prisoner.


 It is also possible that the length of time of which the Defendant will
be imprisoned might be reduced by the award of parole.


 You will be required to answer a Special Issue[ (7)] whether the
Defendant used or exhibited a deadly weapon during the commission of this
offense.


 If you answer "we do" to the Special Issue, the Defendant will not
become eligible for parole until the actual time served equals one-half of the
sentence imposed or thirty (30) years, whichever is less, without
consideration of any good conduct time he may earn. Eligibility for parole
does not guarantee that parole will be granted. 


 If you answer "we do not" to the Special Issue, the defendant will not
become eligible for parole until the actual time served plus any good conduct
time earned equals one-fourth of the sentence imposed. Eligibility for parole
does not guarantee that parole will be granted.


 It cannot accurately be predicted how the parole law and good
conduct time might be applied to this Defendant if he is sentenced to a term
of imprisonment, because the application of these laws will depend on
decisions made by prison and parole authorities.


 You may consider the existence of the parole law and good conduct
time. However, you are not to consider the extent to which good conduct
time may be awarded to or forfeited by this particular Defendant. You are
not to consider the manner in which the parole law may be applied to this
particular Defendant. 


1. Standard of Review

 Counsel did not object to these instructions. An unpreserved complaint about
charge error is reviewed for "egregious harm." Almanza v. State, 686 S.W.2d 157, 171-72
(Tex. Crim. App. 1985) (op. on reh'g). This standard applies to erroneous parole and
good-conduct instructions. Igo v. State, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006);
Jimenez v. State, 32 S.W.3d 233, 235-39 (Tex. Crim. App. 2000). Egregious harm is a
difficult standard that is determined on a case-by-case basis. Ellison v. State, 86 S.W.3d
226, 227 (Tex. Crim. App.2002). Errors that result in egregious harm are those that affect
"the very basis of the case," deprive the defendant of a "valuable right," or "vitally affect a
defensive theory." Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) (citing
Almanza, 686 S.W.2d at 172). The harm to Gardner must be actual, not just theoretical. 
Almanza, 686 S.W.2d at 174. In deciding whether egregious harm exists, we look at (1)
the charge itself, (2) the state of the evidence, including contested issues, (3) the
arguments of counsel, and (4) any other relevant information revealed by the record of the
trial as a whole. Hutch, 922 S.W.2d at 171.

 Gardner argues that because the jury found him guilty of aggravated robbery, an
enumerated offense under article 42.12, section 3g(a)(1)(F) of the code of criminal
procedure, he does not attain parole eligibility until his "actual calendar time served, without
consideration of good conduct time, equals one-half of the sentence. . . ." Tex. Gov't
Code Ann. § 508.145(d) (Vernon Supp. 2008). (8) He raises two complaints about the
aforementioned instructions. First, he complains the charge instructed the jury his
sentence may be reduced through the award of good-conduct time, which is false because
he will not be credited for good-conduct time in terms of calculating his parole eligibility. 
Second, he argues the charge essentially instructed the jury, that if it answers "we do not"
to the Special Issue," he "will not become eligible for parole until the actual time served
plus any good conduct time earned equals one-fourth of the sentence imposed," which is
incorrect because he will not be parole eligible until he served at least one-half of his
sentence.

2. Gardner's First Complaint

 The nature of Gardner's first complaint--that the charge erroneously states that his
sentence may be reduced through the award of good-conduct time--arises from the parole
and mandatory supervision laws. See Tex. Gov't Code Ann. ch. 508 (Vernon 1998 &
Supp. 2008) (entitled "Parole and Mandatory Supervision"). Gardner becomes parole
eligible when he has served the lesser of thirty years or one-half his sentence, and good-conduct time is not to be considered in that calculation. Id. at § 508.145(d). If an inmate
is not released on parole, he or she may be released on "mandatory supervision" when the
inmate's actual time served plus any good-conduct time equals the sentence. Id. §§
508.147, 508.149(b) (Vernon 1998 & Supp. 2008). Gardner is not eligible for mandatory
supervision because of his crime-aggravated robbery. Id. § 508.149(a)(12) (Vernon Supp.
2008). Thus, good-conduct time has no bearing on his release date under either parole
or mandatory supervision. Yet the charge instructed the jury Gardner "may earn time off
the period of incarceration through the award of good conduct time," thereby implying that
it had some bearing on his release date regardless of how the jury answered the Special
Issue. He claims the instruction is erroneous in his case.

 Courts of appeals have considered this issue and have concluded that it is not error
to give the instruction from article 37.07, section 4(a). See Alawad v. State, 57 S.W.3d 24,
26 (Tex. App.-Houston [14th Dist.] 2001, pet. ref'd); Martinez v. State, 969 S.W.2d 497,
501 (Tex. App.-Austin 1998, no pet.); Garcia v. State, 911 S.W.2d 866, 869 (Tex. App.-El
Paso 1995, no pet.). More recently, in Luquis v. State, Luquis challenged the trial court's
submission of the statutorily mandated parole-law instruction at the punishment stage. 72
S.W.3d 355, 357 (Tex. Crim. App. 2002). Gardner argued that because he was not eligible
for release on mandatory supervision, the court erred in giving the instruction concerning
good-conduct time. Id. His core complaint was that the parole law instruction language
concerning good-conduct time is misleading and erroneous because he was not, in fact,
eligible for release on mandatory supervision. Id. at 362. In its analysis, the court of
criminal appeals considered: (1) the instruction in context of the entire charge; (2) whether
the record showed the jury discussed, considered, or tried to apply what they were told
about good-conduct time and parole; (3) that the record did not give any indication, such
as a jury note, that the jury was confused about the possible application of good-conduct
time in the case; and (4) the punishment the jury assessed. Id. at 366-67. The court of
criminal appeals concluded that Luquis had not shown that the instruction "was calculated
to mislead this jury or that there is a reasonable probability that it did mislead this jury." Id.
at 367. Therefore, the trial court did not err in submitting the instruction. Id. at 368.

Application of Luquis factors

 1. The Instruction in the Context of the Entire Charge


 The instruction did inform the jury, in accordance with the statute, that they were not
to consider the manner in which the parole law may be applied to Gardner. We, like the
Luquis court, assume the jury followed this instruction. See id. at 366.

 2. Whether the Record Showed the Jury Discussed, Considered, or Tried to Apply 
 What They Were Told About Good-Conduct Time & Parole


 Nothing in the record suggests the jury discussed, considered, or tried to apply
(despite the judicial admonition not to apply) what it was told about good-conduct time and
parole. The prosecutor did not urge the jury to assess a greater sentence based upon any
potential good-conduct time credits.

 3. Whether the Record Gave Any Indication the Jury Was Confused About the 
 Application of Good-Conduct Time


 The jury did not send out any notes indicating or expressing confusion about the
possible application of good-conduct time to Gardner. Further, the record does not include
any affidavits from jurors showing they were confused about the application of good-conduct time to him.

 4. Punishment Assessed

 Aggravated robbery is a first-degree felony (9) punishable by five to ninety-nine years
or life in prison, plus a fine not to exceed $10,000. Tex. Penal Code Ann. § 12.31(a), (b)
(Vernon 2003). The prosecutor, during closing argument at the punishment stage, told the
jury, "I'm not going to sit here and ask you to send him away for life. . . . I might think that
around 20 or 25 would be a fair number." Despite this argument, the jury assessed a
twelve-year sentence, plus a $10,000 fine. Considering the crime, Gardner's role in it, and
his prior criminal history, the sentence falls within the low end of the punishment range. 

 After applying the Luquis factors, we hold the instruction was neither misleading nor
was it calculated to cause an improper verdict. See Luquis, 72 S.W.3d at 367.

3. Gardner's Second Complaint

 The nature of Gardner's second complaint--the charge incorrectly instructed the
jury he would be parole eligible after serving one-fourth of his sentence--stems from the
required deadly weapon finding. The required deadly weapon finding mandated the court
instruct the jury that Gardner would not become parole eligible until the actual time served
equals the lesser of one-half of the sentence imposed or thirty years, without consideration
of any good-conduct time. The erroneous charge instructed the jury that Gardner "will not
become eligible for parole until the actual time served plus any good conduct time earned
equals one-fourth of the sentence imposed." 

 The argument that egregious harm exists in this situation is that, based on the
erroneous instruction, the jury, in assessing a twelve-year sentence, thought Gardner
would have to serve at least one-fourth of the imposed sentence, or three years, but he
actually must serve at least one-half, or six years. As a result, the jury might have
assessed a greater punishment, which would mean Gardner must actually serve a longer
sentence than the jury would have assessed had the court given them the correct
instruction.

 Several cases have addressed egregious harm in the context of a punishment
charge containing errors and omissions in the parole and good-conduct instructions. 
Several common threads run among those cases. The first factor to consider is the
presumption the jury followed the charge's instructions. See Luquis, 72 S.W.3d at 366;
Parker v State, 119 S.W.3d 350, 357 (Tex. App.-Waco 2003, pet. ref'd); Newman v. State,
49 S.W.3d 577, 581 (Tex. App.-Beaumont 2001, pet. ref'd). Thus, we presume the jury
followed the court's instruction (10) and did not consider parole. See Shavers v. State, 985
S.W.2d 284, 291 (Tex. App.-Beaumont 1999, pet. ref'd); Williams v. State, 975 S.W.2d
375, 378 (Tex. App.-Waco 1998, pet. ref'd). Absent evidence or indications to the
contrary, this presumption prevails. Shavers, 985 S.W.2d at 291; Love v. State, 909
S.W.2d 930, 935 (Tex. App.-El Paso 1995, pet. ref'd); Clayton v. State, 767 S.W.2d 504,
506 (Tex. App.-Amarillo 1989, pet. ref'd).

 When there is a note from the jury regarding parole or good-conduct time, courts
are more prone to find egregious harm. See, e.g., Villarreal v. State, 205 S.W.3d 103,
107-10 (Tex. App.-Texarkana 2006, pet. dism'd); Rogers v. State, 38 S.W.3d 725, 728-29
(Tex. App.-Texarkana 2001, pet. ref'd); Ramos v. State, 831 S.W.2d 10, 17-18 (Tex.
App.-El Paso 1992, pet. ref'd).

 Another factor is the State's emphasis in argument on the possibility of parole. See,
e.g., Rogers, 38 S.W.3d at 730. And, courts also sometimes consider the assessment of
a high or maximum sentence. See, e.g., Villarreal, 205 S.W.3d at 109-10; Rogers, 38
S.W.3d at 730.

 Courts generally agree that the parole instruction was designed to favor the State
and to increase sentences. See Arnold v. State, 786 S.W.2d 295, 300 (Tex. Crim. App.
1990); Williams, 975 S.W.2d at 378; Myres v. State, 866 S.W.2d 673, 674 (Tex.
App.-Houston [1st Dist.] 1993, pet. ref'd); Grigsby v. State, 833 S.W.2d 573, 576 (Tex.
App.-Dallas 1992, pet. ref'd). But it can help the defendant because the jury could learn
that the defendant would serve longer than it expected and could be influenced to assess
less time. Williams, 975 S.W.2d at 378 (citing Myres, 866 S.W.2d at 674).

 A case similar to Gardner's is Igo v. State, 210 S.W.3d 645 (Tex. Crim. App. 2006). 
In that case, at the punishment stage of Igo's trial for sexual assault, the court erroneously
instructed the jury that he would not become parole eligible until the actual time served,
plus good time, equaled one-fourth of the sentence imposed. Id. at 646. The court should
have instructed the jury Igo would not become parole eligible until the actual time served,
without considering good time, equaled one-half of the sentence imposed. Id. Igo did not
object to the charge, and he received the maximum sentence. Id. at 646-47. Finding no
egregious harm, the court of criminal appeals stated:

 First, the parole instruction contained the standard curative language
admonishing the jury not to consider the extent to which the parole law might
be applied to the defendant. Second, parole was not mentioned by either
counsel during argument on punishment. And finally, the evidence relating
to punishment was exceptionally strong.


Id. at 647.

 Here, there is no indication that the jury improperly considered the effect of parole
or good-conduct time. The punishment range was five to ninety-nine years or life, and the
twelve-year sentence is not extreme, given Gardner's two prior felony convictions along
with the fact that Mills received a serious stab wound during the incident. The prosecutor
did not urge the jury to calculate Gardner's sentence from the parole instructions. There
was no indication that the jury failed to follow the instruction to not consider the extent to
which parole or good-conduct time may affect Gardner. We can acknowledge by
speculation that the jury may have calculated that Gardner would have to serve three years
before he could be released, but speculation leads only to theoretical harm, rather than
actual harm. Almanza, 686 S.W.2d at 174 (harm must be actual, not just theoretical);
Curry v. State, 222 S.W.3d 745, 753 (Tex. App.-Waco 2007, pet. ref'd).

 Considering the record as a whole, we hold that the erroneous parole and good-conduct instructions did not prevent Gardner from receiving a fair and impartial trial or
cause egregious harm. See Igo, 210 S.W.3d at 647-48; Williams, 975 S.W.2d at 378. 
Issue five is overruled.



III. Conclusion


 Having overruled all of Gardner's issues, we affirm the trial court's judgment. 


 


 

 ROSE VELA 

 Justice



Do not publish.

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and

filed this 2nd day of October, 2008.
1. See Tex. Penal Code Ann. §§ 29.02, 29.03(a)(2) (Vernon 2003).
2. See Thomas v. State, 821 S.W.2d 616, 620 (Tex. Crim. App. 1991).
3. In Kitchens, the defendant argued that all twelve jurors had to either find he committed sexual assault
or robbery (or both) to convict him of capital murder. The charge included an alternative submission of murder
in the course of committing robbery or sexual assault; thus, each juror was allowed to vote guilty if he or she
found he committed or attempted to commit either underlying felony. Kitchens v. State, 823 S.W.2d 256, 257
(Tex. Crim. App. 1991). The court rejected his argument that the charge concealed a verdict that was not
unanimous. Id. at 258. The court stated, "It is appropriate where the alternative theories of committing the
same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence
is sufficient to support a finding under any of the theories submitted." Id. The court continued that a jury need
not agree on the "preliminary factual issues which underlie the verdict." Id. (quoting Schad v. Arizona, 501
U.S. 624, 651 (1991)).
4. Defense counsel did not object to the charge on the basis that this instruction is a misstatement of
the law.
5. See Russell v. State, 749 S.W.2d 77, 79 (Tex. Crim. App. 1988).
6. Article 37.07, section 4(a) requires the trial court to inform the jury about the effects of parole and
good conduct time for every noncapital felony listed under Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)
(Vernon Supp. 2008). Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a) (Vernon Supp. 2008). Giving this
instruction is a blanket requirement, regardless of whether the defendant is actually eligible for such time. Id. 

7. The special issue asked the jury, "Do you find from the evidence beyond a reasonable doubt that the
Defendant, JONATHAN KEITH GARDNER, used or exhibited a deadly weapon, to wit: a knife, in the
commission of the offense of Aggravated Robbery as alleged in the indictment?" The jury answered, "We do
not."
8. Section 508.145(d) of the government code provides that:


 An inmate serving a sentence for an offense described by Section 3g(a)(1)(A), (C,
(D), (E), (F), (G), (H), or (I), Article 42.12, Code of Criminal Procedure, or for an offense for
which the judgment contains an affirmative finding under Section 3g(a)(2) of that article, is
not eligible for release on parole until the inmate's actual calendar time served, without
consideration of good conduct time, equals one-half of the sentence or 30 calendar years,
whichever is less, but in no event is the inmate eligible for release on parole in less than two
calendar years.


Tex. Gov't Code Ann. § 508.145(d) (Vernon Supp. 2008). 
9. Tex. Code Crim. Proc. Ann. art. 29.03(b) (Vernon 2003).
10. In this case, the trial court instructed the jury: "However, you are not to consider the extent to which
good conduct time may be awarded to or forfeited by this particular defendant [Gardner]. You are not to
consider the manner in which the parole law may be applied to this particular defendant."